[Cite as *State v. Hill*, 2015-Ohio-5166.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO.   26581 |
| | : | |
| v. | : | T.C. NO. 14CRB920 |
| | : | |
| SCHUANTE M. HILL | : | (Criminal Appeal from |
| | : |  Municipal Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___11th___ day of ____December___, 2015.

. . . . . . . . . .

CHRISTINE L. BURK, Atty. Reg. No. 0050559, 10 North First Street, Miamisburg, Ohio 45342
     Attorney for Plaintiff-Appellee

MARIA L. RABOLD, Atty. Reg. No. 0089080, 443 E. Central Avenue, Miamisburg, Ohio 45342
     Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, P.J.

{¶ 1} Shuante M. Hill was convicted after a bench trial in the Miamisburg Municipal Court of assault, a first-degree misdemeanor, and disorderly conduct, a fourth-degree misdemeanor.  Hill appeals from her convictions, claiming that they were based on insufficient evidence and against the manifest weight of the evidence.   For the following

reasons, the trial court's judgment will be affirmed in part, reversed in part, and remanded for further proceedings.

## I. Factual and Procedural History

{¶ 2} The State's evidence at trial revealed the following facts.

{¶ 3} On May 20, 2014, Hill and Reniquia Hughes were neighbors in an apartment complex in Miami Township. At some point during the day, Tonya Green, another resident at the complex, saw Hill outside of Hughes's apartment. Hill was screaming, "Bitch, come outside. You have kids just like I do." Green testified that Hughes was not home.

{¶ 4} Later that same day, in the late afternoon, the complex's clubhouse hosted an event for families with children starting kindergarten during which the children could meet their principal and kindergarten teachers. Hughes attended the event with her kindergarten-age daughter and a teenaged daughter. At approximately 6:00 p.m., Hughes and her children walked back toward their apartment. Along the way, Hughes talked with Deborah Borrero and her family, who had also attended the event. Borrero and her children stopped at the playground, and Hughes and her children kept going.

{¶ 5} As Hughes was in the parking lot near her apartment, Hill approached her and asked if Hughes had complained to the office about her (Hill's) children's toys. Hughes responded that she had not, but Hill "kept walking up on me." Hughes stated that she repeatedly stepped back and asked Hill to back up, but Hill "was aggressive." Hughes testified, "The more I asked her to back up, the more aggressive she got." Hughes asked someone to call the police.

{¶ 6} Hughes testified that Hill struck her (Hughes's) hand, knocking a cup out of

it. Hughes then struck Hill in the face, and a fight ensued. During the altercation, Hill tripped on the curb, and she fell to the ground. Hughes fell on top of Hill, and Hughes was unable to get up because Hill was holding onto Hughes's hair. Hughes testified that Hill bit her right hand, struck her, pulled her hair, and caused her earring to come out. Several people, including Hughes's teenaged daughter, tried to get the women apart. Eventually, the fight was broken up. Hill went back to her apartment after the fight. Hughes waited for the police to arrive.

{¶ 7} At approximately 6:15 p.m., Miami Township Police Officer Scott Miller was dispatched to the apartment complex on a report of a fight in progress. When Officer Miller arrived, people were "just milling around." Hughes approached him and reported that she had been assaulted. At that point, Officers Hesler and Hupp also arrived, and Officer Hupp took a statement from Hughes.[1] Officers Miller and Hesler went to Hill's apartment to get a statement from her.

{¶ 8} Officer Miller testified that he knocked on Hill's door, and she answered it. He could tell from scratches on her face that she had recently been in a fight. Miller had one foot across the threshold, and he used his hip to keep the door open. Miller asked Hill if she could get her identification. Hill responded, "Yes, I can. Step out of my entryway and I will shut the door and go get it." Officer Miller replied, "I will just stay right here, just go grab your ID real quick and we will get this going."

{¶ 9} Hill attempted to close the door on Officer Miller and said that he could not come into her house without a warrant. Officer Miller tried to explain that he was just

---

[1] The transcript spells the officers' names as Hessler and Huff. These appear to be typographical errors. For correctness, we will use the spellings from the police report prepared by Officer Hesler.

there to investigate the fight, but Hill talked over him and yelled at him, using obscenities. Miller stated that he "could not get a word in edgewise." Officer Hesler then stepped in and tried to speak with Hill; Hill "continued to scream and yell" loudly. Officer Miller testified that there were several children in the house and behind him, and that he and Officer Hesler had asked Hill to calm down six or seven times. Miller decided to arrest Hill for obstructing official business and disorderly conduct. Approximately one to two minutes elapsed between the time Officer Miller first asked for Hill's identification and her arrest.

{¶ 10} Officer Miller placed Hill into his cruiser. Hill continued to yell at the officers, complaining that she had been arrested for getting beaten up. While in the cruiser, she stated, "The bitch came up on me and I hit her."

{¶ 11} Hill was charged by complaint with assault, obstructing official business, and disorderly conduct. Following a trial to the court, she was found guilty of assault and disorderly conduct, but acquitted of obstructing official business. On January 29, 2015, after a presentence investigation, the trial court orally sentenced her for the assault to (1) 180 days in jail, with 170 days suspended, conditioned on Hill's successful completion of one year of probation; the 10 days were to be served in two five-day increments; (2) a $180 fine, plus court costs; (3) completion of a one-day anger management class, and (4) one year of reporting probation. As for the disorderly conduct, the court further stated that it was "going to impose the exact sentence I already have, and just run them concurrent."

{¶ 12} The same day as sentencing, the trial court filed three signed "docket entries" for the three charged offenses, which indicated that Hill had been found guilty of

assault and disorderly conduct and acquitted of obstructing official business, respectively. The docket entry for the assault charge reflected the sentence that had been orally imposed by the trial court. The docket entry for the disorderly conduct charge indicated the suspended jail sentence and the imposition of a fine and court costs.

{¶ 13} On February 2, 2015, the trial court filed an "entry and order of conviction and sentence," which the trial court labeled a "final appealable order." The entry stated that Hill had pled guilty to assault and that the trial court had dismissed the charges of obstructing official business and disorderly conduct. The entry reflected the sentence that had been orally imposed for the assault.

{¶ 14} In a subsequent nunc pro tunc entry, filed May 28, 2015, the trial court indicated that Hill had pled guilty to disorderly conduct and that the court had imposed a $180 fine, plus court costs, and had sentenced her to 180 days in jail, with 170 days suspended, to be served concurrently with the jail term for assault. The entry further ordered that the jail term for disorderly conduct be corrected to 30 days in jail, with 20 days suspended.

{¶ 15} Upon Hill's motion, the trial court stayed Hill's jail sentence pending appeal.

{¶ 16} Hill appeals, raising four assignments of error.

## II. Final Appealable Orders

{¶ 17} Before addressing Hill's assignments of error, it is necessary to address the entries filed by the trial court subsequent to Hill's sentencing hearing.

{¶ 18} Crim.R. 32(C) provides:

A judgment of conviction shall set forth the fact of conviction and the

sentence. Multiple judgments of conviction may be addressed in one

judgment entry. If the defendant is found not guilty or for any other reason is entitled to be discharged, the court shall render judgment accordingly. The judge shall sign the judgment and the clerk shall enter it on the journal. A judgment is effective only when entered on the journal by the clerk.

In *State v. Lester*, 130 Ohio St.3d 303, 2011-Ohio-5204, 958 N.E.2d 142, the Supreme Court of Ohio determined that a "judgment of conviction is a final order subject to appeal under R.C. 2505.02 when it sets forth (1) the fact of the conviction, (2) the sentence, (3) the judge's signature, and (4) the time stamp indicating the entry upon the journal by the clerk." *Lester*, paragraph one of the syllabus.

{¶ 19} The trial court filed three docket entries on January 29, the day of Hill's sentencing. The docket entries consisted of a completed form on which the judge indicated Hill's initial plea, the trial court's finding of guilty or not guilty, and the sentence, if applicable. A caption at the top of each document indicated the case name, case number, charge, statutory section for the charge, degree of the offense, offense date, the complainant, and the police agency involved. The entries were signed by the trial judge and filed with the clerk. A statement above the judge's signature stated, "The court has entered a finding in this matter and the defendant has been sentenced appropriately. This has been journalized in the Miamisburg Municipal Court docket;" a handwritten date was provided. These docket entries satisfy Crim.R. 32(C) and are final appealable orders.

{¶ 20} The trial court issued a purported final judgment entry on February 2, 2015. Because the January 29 docket entries were final appealable orders, the February 2 entry was a legal nullity.

{¶ 21} The February 2 entry erroneously stated that the disorderly conduct charge had been dismissed, and the trial court attempted to remedy this omission in its May 28 nunc pro tunc entry. Because the February 2 entry was a legal nullity, that portion of the May 28 entry was also a legal nullity.

{¶ 22} The May 28 entry also attempted to correct the trial court's unlawful sentence (180 days) for disorderly conduct, which was a fourth-degree misdemeanor. *See* R.C. 2929.24(A)(4) (maximum jail term for a misdemeanor of the fourth degree is 30 days). However, nunc pro tunc entries are used only to correct clerical errors so that the record reflects what the court actually decided, not what it might or should have decided. *State v. Winston*, 182 Ohio App.3d 306, 2009-Ohio-2171, 912 N.E.2d 655, ¶ 13-14 (2d Dist.); Crim.R. 36. A court may not use a nunc pro tunc entry to impose a sanction that the court did not impose as part of the sentence at sentencing. *State v. Miller*, 127 Ohio St.3d 407, 2010-Ohio-5705, 940 N.E.2d 924, syllabus. Assuming that the trial court could resentence Hill while her appeal was pending, a nunc pro tunc entry was not the proper vehicle to resentence her. *See* Crim.R. 43(A) (1) (requiring defendant's physical presence at every stage of the criminal proceeding, including the imposition of sentence).

{¶ 23} The final appealable orders before us are the docket entries filed on January 29, 2015.

### III. Sufficiency and Manifest Weight of the Evidence

{¶ 24} Hill's first and second assignments of error claim that her conviction for disorderly conduct was against the manifest weight of the evidence and was based on insufficient evidence. Her third and fourth assignments of error claim that her conviction

for assault was against the manifest weight of the evidence and based on insufficient evidence.

{¶ 25} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). When reviewing whether the State has presented sufficient evidence to support a conviction, the relevant inquiry is whether any rational finder of fact, after viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

{¶ 26} In contrast, "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *Wilson* at ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19 (" 'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion"). When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at

387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 27} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

## A. Assault

{¶ 28} In her third and fourth assignments of error, Hill claims that her convictions for assault were against the manifest weight of the evidence and based on insufficient evidence. Hill asserts that Hughes threw the first punch and that Hill did not throw a punch until Hughes waved her hands in Hill's face and hit Hill's eye. Hill further claims that she established that she acted in self-defense.

{¶ 29} Hughes testified that Hill approached her in an aggressive manner, accusing Hughes of complaining to apartment management about her (Hill's) children's toys. Hughes stated that she kept backing up and asking Hill to step back, but Hill "kept walking up on me." Hughes testified that the fight began after Hill struck Hughes's hand, knocking a cup out of it. According to Hughes, Hill hit her in the face, bit her, pulled her hair, and scratched her during the fight. Hill fell down, pulling Hughes on top of her; Hughes could not get up because Hill had Hughes's hair. Hughes's daughter testified similarly at trial.

{¶ 30} Several individuals at the complex wtinessed the verbal and physical

altercation between Hill and Hughes. Borrero testified that she "heard this massive commotion" with cursing and yelling, and then she saw Hill "swing at Mrs. Hughes." Borrero specifically testified that Hill swung first; prior to that, it was only a verbal altercation. Borrero further testified that every time the fight broke up, Hill went after Hughes.

{¶ 31} Green heard screaming and yelling from inside her apartment. When she came outside, she saw Hughes on top of Hill and that Hill had Hughes's hair. Green stated that she and Hughes's daughter tried to separate Hill and Hughes.

{¶ 32} Hill presented two witnesses on her behalf. Angela Harrison testified that she knew Hill from high school. On May 20, 2014, Harrison was visiting another friend at the apartment complex where Hill lived. Harrison heard arguing in the parking lot near her friend's apartment and came outside. Hughes and Hill were using profanity and had their fingers pointed at each other's faces; Harrison believed they were about to fight. Harrison stated that it looked like Hughes might have poked Hill in the face, and the fight ensued. Harrison testified that she did not know who took the first swing. She stated, "I saw them arguing and then like it was just fightin[g]."

{¶ 33} Gerald Jernigan, a family friend of Hill, testified that he was at Hill's apartment on May 20, 2014, and he went outside with Hill and her daughter to confront a neighbor. Jernigan testified that the neighbor started getting loud and putting her hands in Hill's face, and "then they just starting fightin[g]." Jernigan stated that the neighbor's daughter jumped into the fight to help her mother. Jernigan got Hill's "male friend," who broke up the fight.

{¶ 34} Hill also testified that she talked with Hughes about something that Hughes

supposedly did to Hill's daughter. The conversation turned into an argument, with a lot of gesturing by both women. Hill stated that Hughes hit her (Hill) in the face close to Hill's eye with her (Hughes's) finger. After that, the women fought. Hill testified, "I pulled her hair, she pulled mine, I hit her, she hit me." Hill denied that Hughes ever asked her to let go of Hughes's hair. Hill testified that Hughes's daughter joined the fight, and it was eventually broken up by Hill's friend.

{¶ 35} Considering all of the evidence at trial, the State presented sufficient evidence to support Hill's conviction for assault, and Hill's conviction was not against the manifest weight of the evidence. The credibility of the witnesses and the weight to be given to their testimony were matters for the judge, as the trier of fact, to determine. The State's evidence, if believed, supported a reasonable conclusion that Hill initiated both the verbal and physical altercation between her and Hughes. Although there was conflicting evidence regarding who had started the physical altercation, we cannot say that the trial court lost its way when it found Hill guilty of assault.

{¶ 36} Hill's third and fourth assignments of error are overruled.

### B. Disorderly Conduct

{¶ 37} Hill's first and second assignments of error claim that her conviction for disorderly conduct was against the manifest weight of the evidence and based on insufficient evidence. She argues that there was insufficient evidence to support her conviction, because the State failed to establish that she was intoxicated. The State responds that it was not required to prove intoxication, because Hill was charged under R.C. 2917.11(A), which does not require proof of intoxication, and not R.C. 2917.11(B), which does.

{¶ 38} The complaint, prepared by Officer Miller, alleged that Hill violated "R.C. 2917.11" by "making unreasonable noise and offensively course utterance after being warned to cease and desist the behavior."  That allegation coincides with R.C. 2917.11(A)(2), which states:

(A) No person shall recklessly cause inconvenience, annoyance, or alarm to another by doing any of the following: * * * (2) Making unreasonable noise or an offensively coarse utterance, gesture, or display or communicating unwarranted and grossly abusive language to any person.

In contrast, R.C. 2917.11(B)(1) provides:

No person, while voluntarily intoxicated, shall do either of the following: (1) In a public place or in the presence of two or more persons, engage in conduct likely to be offensive or to cause inconvenience, annoyance, or alarm to persons of ordinary sensibilities, which conduct the offender, if the offender were not intoxicated, should know is likely to have that effect on others[.]

{¶ 39} R.C. 2917.11(E) defines when disorderly conduct is a fourth-degree misdemeanor, as opposed to a minor misdemeanor.  Disorderly conduct is a fourth-degree misdemeanor when the "offender persists in disorderly conduct after reasonable warning or request to desist."  R.C. 2917.11(E)(3)(a).

{¶ 40} Two police reports were attached to the complaint.  Officer Miller's police report identified the disorderly conduct offense as a violation of "R.C. 2917.11A2;" the report made no mention of intoxication.  Officer Hesler's report indicated that Hill appeared to be under the influence of either drugs or alcohol or both when Officer Miller

asked Hill for her identification. He wrote that Hill's eyes were bloodshot and watery and that there was "a moderate odor of an alcoholic beverage coming from her person." However, Officer Hesler did not file the criminal complaint, and his report did not cite the charge against Hill.

{¶ 41} At trial, the State did not assert that Hill had been intoxicated, and it presented no evidence on intoxication. Officer Miller testified at trial that he knocked on Hill's apartment door to investigate the report of a fight. Hill answered the door, and the scratches on her face made it obvious to the officer that Hill had been involved in an altercation. Miller stated that he asked Hill to get her identification, and Hill became upset when Miller would not allow her to shut the door. Officer Miller testified that Hill claimed that he could not enter her house without a warrant and that Hill "kept yelling at me, talking over me, so I could not get a word in edgewise." Officer Miller stated that Officer Hesler stepped in and tried to speak with Hill, but Hill "refused to listen to him, continued to yell and scream."

{¶ 42} Officer Miller testified that Hill was loud and was yelling obscenities. He stated that there were children "all around the place," both in Hill's residence and "out behind us," and that Hill could be heard by the children. Both Officers Miller and Hesler asked Hill to calm down, but she would not. About one to two minutes elapsed from the time that Miller first asked for Hill's identification and Hill's arrest.

{¶ 43} Hill testified on her own behalf that, after the fight, police officers "just walked right in my apartment" while she was changing her clothes. Hill stated that they did not knock, and she did not answer the door. Hill stated that she asked the officers to step outside and allow her to shut the door, but the officers refused. Hill testified that

she was never asked for her identification.

{¶ 44} In closing arguments, the prosecutor argued:

As to the disorderly conduct, there is uncontroverted evidence that the defendant was yelling obscenities repeatedly no less than six requests from the officers to stop and there were children in ear range of this and we know from all the witnesses of course there were children out there, there was a playground nearby and a kindergarten event had just out [sic]. Understandably, they don't deserve to be listening to that.

At the conclusion of the trial, the trial court orally found Hill guilty of disorderly conduct.

{¶ 45} The trial court ordered and reviewed a presentence investigation report before sentencing. The report did not indicate the statutory section under which Hill was convicted of disorderly conduct. In fact, it indicated that Hill had been convicted of assault and obstructing official business, not assault and disorderly conduct. The report's summary of the underlying events for obstructing official business stated, in part: "Police reported a moderate odor of an alcoholic beverage coming from the defendant's person when she spoke in their direction. The defendant reported[ly] kept screaming and would not retrieve her identification." The presentence investigation report referenced Officer Hesler's police report.

{¶ 46} The trial court's January 29, 2015 docket entry (the final appealable judgment entry) identified the disorderly conduct charge as "disorderly conduct M4/Intox," in violation of R.C. 2917.11(B)(1)(E), the voluntary intoxication subsection. The February 2 entry (albeit void) also identified that charge as disorderly conduct, in violation of "R.C. 2917.11(B)(1)(e)."

{¶ 47} Our review of the record reveals that Hill was charged by complaint with disorderly conduct, in violation of R.C. 2917.11(A)(2), which does not require proof of intoxication. The State tried her for a violation of R.C. 2917.11(A)(2), and presented evidence to support a conviction under that provision. Officer Miller's testimony constituted sufficient evidence to support a conviction under R.C. 2917.11(A)(2); the State was not required to present proof of intoxication to support a disorderly conduct charge under that provision. Accordingly, we conclude that the State presented sufficient evidence of disorderly conduct, as charged. In addition, we cannot conclude that the trial court lost its way when it found, at the conclusion of trial, that Hill was guilty of disorderly conduct; the trial court's verdict was not against the manifest weight of the evidence. Hill's first and second assignments of error are overruled.

{¶ 48} Despite the trial court's oral verdict, the judgment entry indicated that Hill was convicted of violating R.C. 2917.11(B)(1), the voluntary intoxication subsection. A trial court speaks through its journal entries. *E.g., State v. Boles*, 2d Dist. Montgomery No. 23037, 2011-Ohio-3720, ¶ 34, citing *Hairston v. Seidner*, 88 Ohio St.3d 57, 58, 723 N.E.2d 575 (2000). Thus, while the complaint charged a violation of R.C. 2917.11(A)(2) and Hill was found guilty of that charge, Hill was *convicted* of violating R.C. 2917.11(B)(1) in the trial court's judgment entry.

{¶ 49} In general, absent a negotiated plea agreement or evidence of a lesser included offense, a defendant cannot be convicted of an offense for which he or she has not been charged. If a judgment entry misidentifies the offense due to a clerical error, that error may be corrected pursuant to Crim.R. 36. *See, e.g., State v. Burton*, 12th Dist. Clermont No. CA2013-09-071, 2014-Ohio-1692, ¶ 14-15 (allowing correction of the

judgment entry where it was "apparent on the record that the reference to R.C. 2907.02(A)(1)(2) in the judgment entry on verdict was a clerical mistake"); *State v. Evans*, 10th Dist. Franklin No. 13AP-939, 2014-Ohio-2081, ¶ 14 (analyzing case as one for attempted patient abuse, the offense to which defendant pled, and encouraging trial court to "correct the clerical mistakes in the record to reflect the proper offense of which [defendant] was convicted."); *State v. Kirk*, 1st Dist. Hamilton No. C-130223, 2014-Ohio-891 (case remanded for a nunc pro tunc entry correcting the judgment entry to reflect that defendant pled guilty to the offense of burglary, not robbery).

{¶ 50} Crim.R. 36 provides that "[c]lerical mistakes in judgments, orders, or other parts of the record, and errors in the record arising from oversight or omission, may be corrected by the court at any time." As we stated in our discussion of nunc pro tunc entries, "[c]lerical errors subject to correction by the court include a mistake or omission that is mechanical in nature and apparent on the record that does not involve a legal decision or judgment. Corrections are proper to make the record reflect what the court actually decided and not what the court might or should have decided or what the court intended to decide." (Citations omitted.) *Burton* at ¶ 14.

{¶ 51} In this case, it is obvious that the trial court's judgment of conviction under R.C. 2917.11(B)(1) was erroneous, but it is not obvious that the trial court's statutory reference in the judgment entry was a clerical error. The presentence investigation report mentions Hill's having an odor of an alcoholic beverage, and it cited Officer Hesler's police report (attached to the complaint), which included facts indicating that Hill was intoxicated when Officers Hill and Hesler attempted to get identification from her at her apartment. It is not apparent from the record whether the trial court believed, at

sentencing, that Hill had been found guilty under R.C. 2917.11(A)(2) or R.C. 2917.11(B)(1).

{¶ 52} Accordingly, Hill's conviction for disorderly conduct in violation of R.C. 2917.11(B)(1) must be reversed, and the matter must be remanded for sentencing on disorderly conduct, in violation of R.C. 2917.11(A)(2).

### III. Conclusion

{¶ 53} The trial court's judgment will be affirmed in part, reversed in part, and remanded for further proceedings. Specifically, Hill's conviction for assault will be affirmed, her conviction for disorderly conduct in violation of R.C. 2917.11(B)(1) will be reversed, and the matter will be remanded for sentencing on disorderly conduct in violation of R.C. 2917.11(A)(2).

. . . . . . . . . . . . .

FAIN, J. and HALL, J., concur.

Copies mailed to:

Christine L. Burk
Maria L. Rabold
Hon. Robert W. Rettich, III