[Cite as *State v. White*, 2017-Ohio-8337.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO.   27244 |
| | : | |
| v. | : | T.C. NO.   15-CR-1164 |
| | : | |
| DEMETRIUS WHITE | : | (Criminal Appeal from |
| | : |  Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___27th___ day of _____October_____, 2017.

. . . . . . . . . .

ALICE B. PETERS, Atty. Reg. No. 0093945, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

CHRISTOPHER B. EPLEY, Atty. Reg. No. 0070981, 10 W. Second Street, Suite 2400, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1}   This matter is before the Court on the August 31, 2016 Notice of Appeal of Demetrius White.   White appeals from his judgment entry of conviction, after a bench trial, on one count of improperly handling a firearm in a motor vehicle, in violation of R.C. 2923.16(B), a felony of the fourth degree.   The trial court sentenced White to community control sanctions for a period not to exceed five years.   We hereby affirm the judgment

of the trial court.

**{¶ 2}** White was indicted on May 29, 2015, and he pled not guilty on June 25, 2015. On February 23, 2016, White signed a Waiver of Counsel form, and the court held a hearing on the waiver. At the hearing, Attorney Enrique G. Rivera-Cerezo indicated that he was appointed to represent White in August of 2015. After the court went over the elements of improperly handling a firearm in a motor vehicle, the affirmative defenses thereto, the potential penalties upon conviction, and advised White against proceeding pro se, White expressed a continued desire to represent himself. Pursuant to White's request to proceed pro se, the court advised White that Rivera-Cerezo would be available on a "standby" basis at trial but would not be engaged in trial preparation or participate in the proceeding.

**{¶ 3}** On April 25, 2016, a final pretrial conference was held, at which Attorney Kenneth Hanson appeared on behalf of White and requested a continuance so that White could apply for diversion. The court continued the trial date until May 31, 2016 and relieved Rivera-Cerezo "of the role of advisor." On April 26, 2016, Hanson filed a "Notice of Appearance of Counsel/ Substitution of Counsel."

**{¶ 4}** On May 31, 2016, the trial court issued an "Order of Appointment" designating Attorney Justin M. McMullen as counsel for White, noting that White is indigent and unable to afford counsel. On June 6, 2016 the court held a scheduling conference, where the prosecutor indicated as follows:

> Turning to page 6, under scheduling conferences, Demetrius White, Case Number 2015CR1164, Justin McMullen standing in as standby counsel although, Your Honor, last we were here, my understanding is Mr.

McMullen was just appointed. I believe, after speaking with our appellate division, we do need to hold a brief hearing so that the defendant, the Court can make a determination that the defendant can represent himself since after the last hearing, he did retain private counsel.

The court scheduled a hearing for June 8, 2016.

{¶ 5} At the June 8, 2016 hearing, White indicated to the court that he wished to proceed pro se. White stated as follows:

* * * I didn't seek Kenneth Hanson out to be my attorney. I actually seeked [sic] him out to be an expert witness and when he viewed the facts of the case, he decided, he asked me if he could be my attorney and he would represent me pro bono. And I figured that would be the best interest to have an attorney representing me, so I agreed.

And then the day we came here to discuss, I think it was before the last court date, he told me that he could get the charges dismissed if I just took the Diversion Program because, you know, just like give a little - get a little. But then after coming to court, I realized that that was not, indeed, the case.

So after we left court, I contacted him several times trying to understand what happened and what with the situation [sic]. He never responded back to me or my text messages, my calls to his office. So I just figured - - I did leave a message letting him know that I was going to continue the case and I wasn't going to take the program and he never responded back. So I just assumed he wasn't going to take the case.

{¶ 6} The court repeated the advisements and inquiry of the first hearing on White's request to proceed pro se.   White executed a "Wavier of Jury Trial" and a "Waiver of Counsel" at this second hearing.   The State indicated that its offer of Diversion was rescinded.

{¶ 7} On June 13, 2016, the court held another final pretrial conference, whereupon White asked the court to take judicial notice of the fact that delivering pizzas carries a high risk of assault, and that the Dayton Police Department implemented "special training" for delivery drivers in 2011.   The court declined to do so.

{¶ 8}   The bench trial occurred on June 23, 2016.   At the start of the proceedings the court noted Justin McMullen was proceeding as trial counsel and not acting in a standby capacity, as White indicated that he wished to proceed with counsel's representation.   The parties then stipulated that White does not have a valid license or a temporary emergency license to carry a concealed firearm, or a license to carry a concealed weapon issued in another State with the benefit of reciprocity in Ohio.   The parties further stipulated that White is not under disability or prohibited from owning a firearm.

{¶ 9}   Roger Hoff testified that he is a patrol officer in the City of Trotwood Police Department, having been employed in law enforcement for over 17 years.   Hoff stated that on April 14, 2015, he was patrolling alone in a marked cruiser when he observed White, alone, in a blue Oldsmobile Cutlass, heading north on Salem Avenue near Wolf Road.   He stated that White's license plate light was not working, and that he accordingly initiated a traffic stop.   Hoff testified that he observed White "reaching over towards the front passenger seat area" in what Hoff characterized as a "furtive movement."   Hoff

stated that the surrounding area is known for drug activity. He testified that he approached White's vehicle on the passenger side. Hoff stated that he advised White of the reason for the stop, namely that his license plate light was not working. Hoff testified that White gave him his driver's license and proof of insurance, as well as the title to the vehicle.

{¶ 10} According to Hoff, he observed that White was dressed as a pizza delivery driver. He stated that there were a number of items on the front seat beside White, including a jacket that was "pushed over to the side." In response to a question from Hoff regarding White's destination, Hoff testified that White advised him that he had just left work at Domino's and was on his way to his girlfriend's house in the Englewood area. Hoff testified that he did not observe anything in plain view inside the vehicle that he considered dangerous. Hoff stated that he advised White to remain in his vehicle and returned to his cruiser to perform a records check. Once in his cruiser, Hoff testified that he again observed White reach over towards the front passenger side of his vehicle. According to Hoff, there are "a number of concealment places in any vehicle."

{¶ 11} Hoff stated that Officer Jackson arrived on the scene while he was in his cruiser, and that he asked Jackson to approach White's vehicle to "see what he's reaching for and kind of keep an eye on him." Hoff stated that Jackson then got his attention by waiving for Hoff to approach the vehicle. Hoff testified that he approached White's vehicle on the driver's side and asked White to exit his vehicle. Hoff stated that he detained White and placed him in his cruiser. He testified that at the time, he had learned from the records check that White was under a license suspension for failure to reinstate his license. According to Hoff, White's vehicle was titled to him, but "he still had the plates

of the former owner attached to it which is a fourth degree misdemeanor." Hoff stated that White "would be cited at the very least for the DUS and the vehicle would be impounded since it is, technically, an unlicensed motor vehicle."

{¶ 12} Hoff testified that he advised White that his vehicle would be impounded, and that White "advised me that there was an AR-style type rifle in the front seat of the vehicle." Hoff stated that he returned to White's vehicle. He testified that "the winter coat had shifted," and he could see the "buttstock of what * * * was commonly found on AR-style type rifles." Hoff stated that the rifle "is a very common semiautomatic type of rifle that is out in possession of the general public today."

{¶ 13} Hoff testified that he removed the rifle from White's vehicle and determined that it "was a .22 long-rifle," and that it did not contain a magazine. He testified that he also retracted the bolt to ensure that there was no ammunition in the chamber. Hoff testified that he then conducted an inventory search of the vehicle pursuant to Police Department policy, and that he found ammunition behind the passenger seat on top of trash that was piled on the floorboard of the car. He stated that magazine "was loaded with a number of live rounds" for a .22 long rifle. Hoff testified that the magazine was not contained inside any sort of separate container. He stated that the magazine was within arm's reach of the driver of the vehicle. Hoff testified that when "I found the firearm and I found the loaded magazine, determined that I absolutely had a violation of law, went back and I mirandized the defendant. He stated he understood his Miranda rights and then he waived his right to any attorney and stated that he would answer my questions."

{¶ 14} Hoff testified that he asked White why he had the rifle in his car, and that White "didn't really give me any kind of a reasons why he had it up there." According to

Hoff, White "said initially that the rifle was stored in his trunk while he was working and * * * when he got off work, he moved it from the trunk to the front passenger compartment of the vehicle. He stated that the rifle was never loaded and that he never had a magazine in the rifle." Hoff identified photos taken by him of White's vehicle and the front passenger compartment "including the coat that was used to conceal the rifle and the magazine and the location of the magazine in the vehicle." He testified that "when we searched the vehicle, we immediately found the magazine so nothing in the vehicle except for the coat, when I moved the rifle, had been moved or displaced. So it's exactly how the vehicle was when it was pulled over." Hoff stated that he packaged the rifle and magazine and he identified the box he put them in marked with his initials and an evidence tag. He removed the weapon from the box and identified it as being in the same condition as when he recovered it. Hoff also identified the magazine, and he testified that it differed from the photograph thereof because it was not loaded so the "follower" was visible. Finally, Hoff identified the 19 live rounds of ammunition that were inside the magazine when he recovered it. He testified that the rifle could be loaded and ready to fire in a few moments.

{¶ 15} On cross-examination, when asked if the rifle could be used for purposes of self-defense inside a vehicle, Hoff responded, "not generally, because it's not something that can be carried, carried concealed, carried outside of a vehicle without having issues on that." He noted that the stop occurred at 2:05 a.m. Hoff stated that at the time of White's arrest, he was not aware that White had previously been robbed while delivering pizzas. He testified that he is "aware of other pizza delivery driver robberies," and that he investigated the robbery of a pizza delivery driver named Fortis Stover in April

of 2015 that occurred within a mile or two of White's traffic stop.

**{¶ 16}** When asked if he believed pizza delivery drivers were "being targeted" in the area he patrols, Hoff responded that "[g]enerally when we have a pizza delivery driver that's robbed, it's usually a call that's come in. They ask for a pizza to be delivered to a vacant house. Once the pizza delivery driver is out of their vehicle and approaching and trying to deliver the pizza, they will ambush him outside of the vehicle and then initiate a robbery." Hoff stated that occasionally "after that, they've stolen the pizza delivery driver's keys and taken their vehicle."

**{¶ 17}** On redirect examination, Hoff stated that a pizza delivery robbery does not occur "every day even every month. At times, it seems it goes in spurts." Hoff stated that while he was on patrol, he was not aware of any threats that were made against White.

**{¶ 18}** John Porter testified that he is the deputy chief of police at the Trotwood Police Department, with 31 years of law enforcement experience. The court designated Porter an expert in rifles and firearms at the State's request. Porter testified that he tested White's rifle in April of 2016 by firing six rounds at the Miami Valley Shooting Grounds. He stated that he tested the rifle in a manner that is generally accepted to test rifles. Porter stated that he concluded to a reasonable degree of scientific certainty that "the weapon operates correctly and at the time that it was most likely seized, it was operating in [a] correct manner in fashion and form as designed." Porter stated that the ammunition seized with the weapon was appropriate for use with the weapon.

**{¶ 19}** At the conclusion of Porter's testimony, the State rested, and White moved for an acquittal. The court overruled the motion. Ronald Strehle then testified that he

is a "Crime Prevention and Analysis [sic] for the West Patrol Operations Division" of the Dayton Police Department, having been so employed for five years. He stated that he also has 16 years of patrol experience with the Dayton Police prior to his current position. Strehle testified as follows:

Back in the last part of 2011 and 2012, we saw about a 40 percent increase in pizza delivery driver robberies. We instituted a Safe Delivery project which included pizza delivery drivers, Chinese food, any kind of food delivery. We gave a class on what to do if they felt something was wrong because reading the reports, we found in about 75 percent of those cases the driver may have felt something was wrong. And we gave them instructions to do something different - - call back the number, don't deliver the food, drive around the block see what was going on. Basically, their safety was their responsibility because they're the only ones that are there.

{¶ 20} Strehle stated that they try to conduct the training twice a year. The following exchange occurred:

Q. Do you believe that food delivery drivers contain some inherent risk in their job, is that why this program was put into place?

A. Well, it was despite the 40 percent increase. But, yes. The reason we continue it is because they have the same vulnerabilities that police officers do. You can come to a certain spot at a certain time and somebody else is controlling that. They can call you to order a pizza to 123 Smith Street and know you'll be there within a half hour to 45 minutes.

Q. And based on your experience with these drivers and these

drivers typically aren't armed like police officers are, correct?

A. No.

Q. Based on your training and experience that you talked about here, community IMPACT panels and as a pizza delivery driver/manager trainer, what kind of risks have you seen that these drivers face?

A. The majority of what I've seen that delivery drivers have been victim to have been robbery.

Q. Robbery. And because they can be called to a specific place, do you think that they're particularly susceptible to robbery?

A. In the cases of this, yes.

Q. And what makes you reach that conclusion?

A. Just because that they can be called to a specific place at a specific time and it's in the control of the robber not necessarily the delivery driver.

* * *

Q. * * * Do you have any knowledge or experience about whether these statistics that you saw in Dayton regarding these robbery stats are as similar to that which is * * * found in the Trotwood area?

A. I have no idea.

Q. * * * Well, that doesn't change your opinion about whether pizza delivery driving is a dangerous job or one that's susceptible to these crime attacks, right?

A. No, it doesn't change it, at all.

Q. * * * In the Dayton area, do you know how many pizza delivery driver incidents there were involving robberies in 2015?

A. * * * I looked, I think it was 14 to 16.

Q. * * * How did you reach that figure?

A. I ran the numbers of how many pizza delivery drivers that were robbed. I just put in the dates and the area and that was for the entire west side. That wasn't for just the Fifth District.

Q. * * * Are you aware of any precautions that pizza stores make for their employees that are on-site?

A. No.

{¶ 21} On cross-examination, Strehle acknowledged that the 2015 robbery rates for pizza delivery drivers are lower than those in 2011 and 2012, and that he has no knowledge of the crime statistics in Trotwood. He stated that a total of 112 robberies were reported on the west side of Dayton in 2015, and that roughly ten percent involved pizza delivery drivers. Strehle stated that the west side of Dayton encompasses "the entire city of Dayton from the river over, the river west," and that it is approximately 15 square miles.

{¶ 22} Dylan Mills testified that he is employed as an assistant manager of the Domino's where White worked, which is located at 3512 Siebenthaler Avenue. Mills stated that delivery drivers are required to call the customers before they leave the store and when they arrive at the delivery locations. He stated that they are only allowed to carry $20.00 at all times. Mills stated that the delivery vehicles are not identified as such because "it kind of makes them a target really." He stated that the drivers are required

to wear a uniform consisting of a blue shirt, black pants or shorts, and a hat. Mills stated that the drivers are not permitted to carry weapons when making deliveries as a matter of store policy. On cross-examination, Mills stated that his store makes around 70 deliveries a day during the week and about 100 deliveries a day on the weekends. He stated that he is aware of two robberies reported at his store.

{¶ 23} White testified that he began working at Domino's at the beginning of January 2015, and that he quit in June of 2015. White stated that he quit his job at Domino's because there "was too many risk factors, being robbed, being targeted. And then I have being [sic] charged with a felony for trying to defend myself." White testified that he was robbed on March 31, 2015, at approximately 10:00 p.m. He stated that on that date as he approached the delivery address, he noticed that no lights were on there. White testified that he proceeded to the house across the street, which had an illuminated porch light. He stated that he realized he was at the wrong address and approached the first address again. At that point, according to his testimony, he heard "leaves on the ground being crushed and I go look over the side and there's a guy coming out from behind the house." He stated that in the course of the delivery he did not perform Domino's safety protocols by making the call-back to check the address. White stated that he asked the man he observed if he was at the correct address, and that the man indicated it was. White testified that he went to get the pizza from the car, and that as he did so, he heard the man approaching him from behind. White stated that the man pointed something at him that he later learned was a Taser. White stated that he told the man that he could have the pizza, and that the man then asked for his car. White stated that he threw the pizza at the man, and after a struggle, during the course of which he

heard additional voices coming from behind the house, he returned to his car to get away. According to White, it was "pretty dark and there was some trees in the background but I seen a lot of bodies coming from behind the house and the garage." He stated that the man followed him and was trying to Tase him through the open window of his car. White stated that he "was swinging, trying to get him off of me." White testified that he heard a voice mention a "burner," which he recognized as a street term for a gun, and that he stopped fighting with the man and focused on putting his key in the ignition of his vehicle. White testified that he returned to Domino's and called the police. White testified that the people at the scene of the robbery observed him and his vehicle, and that they are aware of the store from which he delivered the pizza. White stated that he felt "not too safe" since there were no arrests after the incident. He testified that he purchased the rifle at Gander Mountain on April 6, 2015.

{¶ 24} White testified that he started his shift on the date of his arrest at 5:00 p.m. He stated that he placed the rifle inside his vehicle "when it started getting round nighttime." White stated that he told Hoff that the rifle initially was "in the trunk. And then he got up and walked away. So I was not able to fully explain the situation." White stated that he was arrested approximately 10 minutes after he completed his shift. He stated that the rifle was in the car as a means to defend himself because he "had been attacked." He stated that the rifle and the magazine were within his reach in the vehicle. According to White, he feared he would be robbed again, because at the scene of the robbery, "as I was leaving, they did say we're going to see you again, Pizza man, and were making threats when I was leaving and they had not been caught." White stated that he believed that while employed at Domino's, the only way to protect himself from

another robbery was to carry a firearm.   He stated that he purchased a rifle because at the time he was only 20 years old and accordingly he "cannot carry a handgun or get [an] emergency temporary handgun license."

{¶ 25} The following exchange occurred regarding White's actions upon leaving work on the night of his arrest:

Q.   When you were stopped, were you coming from work?

A.   Yes, I was.

Q.   Did you make any stops along the way?

A.   Yes, I did.

Q.   And where did you stop?

A.   I stopped at the Sunoco gas station which is on the way.

Q.   Where's the Sunoco relative to your store where you left?

A.   It's not that far actually.   It's like right down the street.

Q.   Why did you stop there?

A.   I called my girlfriend to let her know that I was on my way.   She asked me to pick up a couple of drinks and some chips so I did, so.

{¶ 26}   White asserts two assignments of error which we will consider together. They are as follows:

THERE   WAS   INSUFFICIENT   EVIDENCE   TO   CONVICT APPELLANT OF *KNOWINGLY* IMPROPER HANDLING OF A FIREARM IN A MOTOR VEHICLE. [sic]

And,

THE   VERDICT   SHOULD   BE   REVERSED   BECAUSE   IT   WAS

AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶ 27}** As this court had previously noted:

All crimes are statutory. Criminal liability requires (1) commission of a statutorily prohibited act or omission (2) with the degree of culpability the statute requires. R.C. 2901.21(A). It is the prosecution's burden to prove those elements of the offense beyond a reasonable doubt. R.C. 2901.05(A). However, "[t]he burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, is upon the accused." *Id.*

*State v. Sheffield,* 2d Dist. Montgomery No. 20085, 2004-Ohio-4123, ¶ 6.

**{¶ 28}** As this Court has further previously noted:

"A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). When reviewing whether the State has presented sufficient evidence to support a conviction, the relevant inquiry is whether any rational finder of fact, after viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

In contrast, "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *Wilson* at ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19 (" 'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion"). When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983).

Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

*State v. Hill*, 2d Dist. Montgomery No. 26581, 2015-Ohio-5166, ¶ 25-27.

{¶ 29} R.C. 2923.16(B) provides: "No person shall knowingly transport or have a

loaded firearm in a motor vehicle in such a manner that the firearm is accessible to the operator or any passenger without leaving the vehicle."

{¶ 30} R.C. 2923.16(K) provides:

* * *

(5)(a) "Unloaded" means * * * that no ammunition is in the firearm in question, no magazine * * * is inserted into the firearm in question, and one of the following applies:

(i) There is no ammunition in a magazine * * * that is in the vehicle in question and that may be used with the firearm in question.

(ii) Any magazine * * * is stored in a compartment within the vehicle in question that cannot be accessed without leaving the vehicle or is stored in a container that provides complete and separate enclosure.

{¶ 31} White's first assignment of error is addressed to the "knowingly" element of R.C. 2923.16(B). R.C. 2901.22(B) governs culpable mental states and provides:

A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

{¶ 32} White in his brief directs our attention to an exchange that occurred at the

June 8, 2016 hearing on White's waiver of right to counsel. After the court read aloud the statutory definition of "knowingly" as set forth above, the court continued as follows:

\* \* \*

Since you cannot look into the mind of another, knowledge is determined from all the facts and circumstances in evidence.

The Court's going to determine from the facts and circumstances whether there existed at the time, in your mind, an awareness of the probability that you were transporting or had a loaded firearm in a motor vehicle and that the firearm was accessible to, in essence, you without leaving the vehicle.

Do you understand that?

THE DEFENDANT: So you're saying if, so if my weapon was, if I did not know my weapon was loaded but I knew it was accessible to me, is that still? [sic]

ME. HENNE: Your Honor, the State would object to any advice that either the Court or any other standby counsel would give to the defendant on that matter. That is a triable issue at this point in time. If that's the issue that the defendant wants to raise at trial that is, again, for trial and not for anyone to give legal advice to at this juncture.

THE COURT: Very well.

{¶ 33} White asserts as follows:

Appellant contends that he did not fail to make inquiry or act with a conscious purpose to avoid learning the fact. He testified that he [had] a

gun in his car. Appellant researched pizza delivery and guns, went to Gander Mountain and properly bought a gun. He transported it separate from the magazine (albeit in the vehicle) which he believed was proper based on his inquiry (research). He subjectively believed that was proper. Therefore there was no mens rea – Appellant did not have a culpable mental state – in this matter to convict Appellant of the charge.

{¶ 34} As noted by the Supreme Court of Ohio:

* * * It is an ancient maxim that all are conclusively presumed to know the law. See 42 Ohio Jurisprudence 3d (1983) 401, Evidence and Witnesses, Section 143, and cases cited therein. To hold otherwise would be to lend credence to the defense of ignorance of the law for any offense in which "knowledge" is an element. Knowledge that certain conduct is unlawful is not a necessary element for conviction based on actions done "knowingly." *E.g., State v. Bissantz* (1982), 3 Ohio App.3d 108, 3 OBR 123, 444 N.E.2d 92.

*State v. Pinkney*, 36 Ohio St.3d 190, 198, 522 N.E.2d 555 (1988).

{¶ 35} Officer Hoff testified that White advised him that the rifle was in the front seat of his vehicle, that he removed it therefrom, and that he discovered the magazine behind the passenger seat on a pile of trash. White testified that the rifle and the magazine were within his reach in the vehicle when he was stopped. White's subjective belief that he acted lawfully does not negate the "knowingly" element of the offense, as it is undisputed that he transported the weapon in violation of the law. Accordingly, we conclude that a rational finder of fact, after viewing the evidence in a light most favorable

to the State, could find that White knowingly transported a loaded firearm in his motor vehicle in such a manner that the firearm was accessible to him without leaving the vehicle. In other words, White's conviction is supported by sufficient evidence. White's first assignment of error is overruled.

{¶ 36} In his second assignment of error White directs our attention to R.C. 2923.12(D)(1), which he asserts "provides an affirmative defense to the charge of improper handling of a firearm." R.C. 2923.16(G)(1) provides: "The affirmative defenses authorized in division (D)(1) and (2) of section 2923.12 of the Revised Code are affirmative defenses to a charge under division (B) or (C) of this section that involves a firearm other than a handgun." R.C. 2923.12 provides in relevant part:

(D) It is an affirmative defense to a charge under division (A)(1) of this section of carrying or having control of a weapon other than a handgun and other than a dangerous ordnance that the actor was not otherwise prohibited by law from having the weapon and that any of following applies:

(1) The weapon was carried or kept ready at hand by the actor for defensive purposes while the actor was engaged in or was going to or from the actor's lawful business or occupation, which business or occupation was of a character or was necessarily carried on in a manner or at a time or place as to render the actor particularly susceptible to criminal attack, such as would justify a prudent person in going armed.

{¶ 37} While there was testimony regarding the risk involved in delivering pizzas as well as testimony that the area where the stop occurred is known for drug activity, we cannot conclude, given the conflicting testimony concerning when the rifle was placed

into the truck's front passenger compartment, that the trial court's decision is against the manifest weight of the evidence regarding the affirmative defense established by R.C. 2923.16(G)(1) and R.C. 2923.12(D)(1). If the trial court concluded that White, consistent with Hoff's testimony, placed the rifle into the truck's front passenger compartment after his employment shift ended, the affirmative defense would have no application. White, of course, testified otherwise, but we cannot conclude, given the conflicting testimony, that the trial court clearly lost its way, and, as a result, created such a miscarriage of justice that a reversal and resulting new trial is required. In other words, having reviewed the entire record, we cannot conclude that White established an affirmative defense to his offense. Accordingly, we conclude that White's conviction is not against the manifest weight of the evidence. White's second assignment of error is overruled.

{¶ 38} For the foregoing reasons, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

HALL, P.J. and TUCKER, J., concur.

Copies mailed to:

Alice B. Peters
Christopher B. Epley
Hon. Timothy N. O'Connell